**IN THE COURT OF APPEALS OF IOWA**

No. 22-0651
Filed June 15, 2022

**IN THE INTEREST OF M.G., J.G., and L.G.,**
**Minor Children,**

**R.H., Mother,**
      Appellant,

**J.G., Father,**
      Appellant.

_____

Appeal from the Iowa District Court for Dubuque County, Thomas J. Straka, Associate Juvenile Judge.

A mother and father separately appeal from the termination of their parental rights.  **AFFIRMED ON BOTH APPEALS.**

Taryn R. McCarthy of Clemens, Walters, Conlon, Runde & Hiatt, L.L.P., Dubuque, for appellant mother.

Bridget L. Goldbeck of Hughes & Trannel, P.C., Dubuque, for appellant father.

Thomas J. Miller, Attorney General, and Kathryn K. Lang, Assistant Attorney General, for appellee State.

Kristy L. Hefel, Public Defender Supervisor, Dubuque, attorney and guardian ad litem for minor children.

Considered by May, P.J., and Greer and Chicchelly, JJ.

**GREER, Judge.**

The mother and the father share three children—M.G., J.G., and L.G., born in 2019, 2017, and 2016 respectively. The children were living with the mother in June 2020 when the Iowa Department of Human Services (DHS) was alerted to concerns of physical abuse of L.G. by the mother and use of illegal drugs around all of the children. Though the children were returned to the mother's care in March 2021, they were removed again that August when the mother relapsed into drug use and stopped addressing her mental health. Following the termination of their parental rights in April 2022, both parents appeal, but neither dispute the grounds for termination. Instead, they each request additional time to work toward reunification. The father also argues termination of his parental rights is not in the children's best interests, and the mother also argues her bond with the children outweighs the need for termination. Because termination of the father's rights is in the children's best interests, neither parent convinced us the children can be safely returned to their care if given six additional months, and the mother's bond with the children does not outweigh the need for termination, we affirm the juvenile court's termination of the mother's and the father's parental rights.

**I. Facts and Background Proceedings.**

In June 2020, DHS received reports of bruising on L.G.; the mother subsequently admitted she repeatedly spanked the child hard enough to leave the bruises. The children were placed with a family member, and the mother began engaging in services, including daytime and overnight visits. But, in August, while the children were with the mother, the mother's paramour committed an act of domestic violence against her. There were also allegations that the mother was

using methamphetamine and marijuana while caring for the children. All three children tested positive for methamphetamine in September, and the mother admitted using. The children were adjudicated children in need of assistance.

Service providers were able to get in contact with the father, who was made aware of the situation. At that time, he had not seen the children in about a year, though the children's paternal grandmother was in contact with the mother. Services were set up for the father, but he stopped participating or responding to providers. He was also instructed to take random drug tests; he did not comply.

The mother participated in services and made great strides in addressing her substance-abuse and mental-health concerns,[1] so the children were returned to her care in March 2021. But, by late April, the mother stopped going to her counseling and substance-abuse services, including her random drug testing— she missed tests on April 30, May 4, May 13, May 24, June 20, and June 23. When she tested in July, the results came back positive for methamphetamine, and she admitted she had relapsed. Family members reported the mother's behavior was becoming erratic and she threatened suicide several times. In early August, the children were placed in foster care.

In September, the father began showing an interest in engaging with services and seeing the children again. By this point, two years had passed since he saw them. Once more, he missed scheduled appointments and stopped communicating.

---

[1] The mother has been diagnosed with bipolar disorder, generalized anxiety, post-traumatic stress disorder, and panic disorder.

The mother began missing visits and failed to follow through with mental-health or substance-abuse services. She continued to use methamphetamine and marijuana, including with her paramour. Her paramour committed several additional acts of domestic violence against her between October 2021 and January 2022.[2] Two such incidents occurred in her apartment which, coupled with her inability to pay rent, led to her eviction in November 2021. Since that time, she has not found stable housing—she entered a number of shelters or programs that would allow her children to stay with her but has either left by choice or been discharged for non-compliance.[3] When not in a shelter, she stayed with her paramour or with other friends or family.

To her credit, the mother began consistently attending mental-health therapy in January 2022. From that time until the termination hearing, she attended thirteen of sixteen offered visits with the children. When the mother attended visits, the interactions went well; she was able to supervise the children, always came with a meal or snack for them, and they seemed happy to be with her. Her continued inconsistency with services, though, prevented the visits from increasing beyond supervised, two-hour sessions. As of the termination trial, the mother had yet to complete either inpatient or outpatient treatment offered. Even so, in the two weeks before the termination hearing, the mother entered an unlicensed sober living community—although this center provided drug testing and

---

[2] A no-contact order was in place between the mother and the paramour with the mother as the protected party, but she stayed in the relationship. At the time of the termination hearing, she sought to have the order lifted.

[3] She was discharged once for not being back to the shelter by curfew. Her second discharge occurred because of contact with her paramour in violation of the no-contact order.

some group meetings, it would not allow for the children to stay with her. She admitted to use about three weeks before entering the center, but while there, her drug tests were negative for methamphetamine and she reengaged with substance-abuse treatment. She also found a new, full-time job as a cook. But, her housing situation was temporary; she was five months pregnant[4] with her paramour's child and she could not stay in the community after she gave birth.

During this chaotic time for the children, the father was missing in action. While for the majority of the case, the mother had a no-contact order in place against the father, the order did not prohibit his contact with the children.[5] Still, DHS attempted to make contact with him by mail and phone to no avail. Finally, in the fall of 2020, the father provided DHS with an address and reported he had been sober for a year and a half. At the onset of the family's involvement with DHS, the father avoided services, so no drug test results confirm his sobriety. Around September 2021, DHS began working with the father and discussing how he could reestablish contact with the children. The father explained he was living with his mother, looking for work, and was willing to travel to see the children. But by the end of the month, after only a few video calls with providers and without seeing or speaking with the children, the father stopped attending scheduled virtual meetings. In the two days leading up to the termination hearing, the father called the caseworker again; but, by the time of the termination hearing, it had been over two years since his last contact with the children.

---

[4] The mother admitted to using illegal drugs during her current pregnancy.
[5] At the time of the termination hearing, the no-contact order had expired.

Both parents testified at the termination hearing. The father explained that he had been homeless and without a phone or car of his own for most of the case—he had listed his mother's address and relied on her or friends for phone access. At the time of the termination hearing, he had just started a new job and shared an apartment with a friend in Illinois. He asked for additional time to begin participating in services. The mother also testified that, while she agreed the children could not be returned to her at that time, she thought she could be back on her feet in six months' time.

Originally, the children were placed in two separate foster homes. But, as of the termination hearing, the children were placed together and acclimating to a pre-adoptive home.

The mother's parental rights were terminated under Iowa Code section 232.116(1)(f), (h), and (*l*) (2022). The father's rights were terminated under Iowa Code section 232.116(1)(b), (e), (f), and (h). Both now appeal.

**II. Analysis.**

When reviewing a termination of parental rights, our review is de novo. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). Neither parent challenges the grounds for termination, so we do not discuss them. *See id.* Instead, the mother contends the court should have forgone termination because of the strength of the bond between the mother and the children or, alternatively, she should have been given an additional six months. The father asserts termination is not in the children's best interests and the State should have given him an additional six months to reunite with the children. We address the parent's challenges in turn.

*a. Best Interests.*

The father first argues termination is not in the children's best interests. We disagree. When evaluating children's best interests, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). "[T]he legislature 'has significantly, and not too subtly, identified a child's safety and his or her need for a permanent home as the defining elements in a child's best interests.'" *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011) (citation omitted). Because the father has been absent from his children's lives for so long, he has demonstrated no ability to care for or protect them for the long haul. Termination, on the other hand, affords them an opportunity at permanency the father has not provided. *See P.L.*, 778 N.W.2d at 41 ("It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child."). We agree with the juvenile court, then, that termination of the father's parental rights is in the children's best interests.

*b. Additional Time.*

Both parents assert the juvenile court should have given them an additional six months to reunite with the children. To grant a six-month extension, the court must be able to "enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child[ren] from the child[ren]'s home will no longer exist at the end of the additional six-month period." Iowa Code § 232.104(2)(b).

The mother had only recently begun making progress and has not demonstrated an ability to maintain that progress. *See In re A.B.*, 815 N.W.2d 764, 778 (Iowa 2012) ("Insight for the determination of the child's long-range best interests can be gleaned from 'evidence of the parent's past performance for that performance may be indicative of the quality of the future care that parent is capable of providing.'" (citation omitted)). While we are hopeful the mother will keep making strides, she had only a few weeks of sobriety—in a controlled living environment—under her belt at the time of the termination hearing and had not yet successfully completed any substance-abuse treatment. *See id.* at 776 ("We have long recognized that an unresolved, severe, and chronic drug addiction can render a parent unfit to raise children."); *In re J.B.*, No. 18-0696, 2018 WL 4361058, at *3 (Iowa Ct. App. Sept. 12, 2018) ("[The mother] had been participating in treatment for two months and still lived in an inpatient treatment facility at the time of the permanency hearing. . . . [H]er last-minute efforts are insufficient."); *In re Z.R.*, No. 17-1004, 2017 WL 4050989, at * 4 (Iowa Ct. App. Sept. 13, 2017) ("Where, as here, 'the parent has been unable to rise above the addiction and experience sustained sobriety in a noncustodial setting, and establish the essential support system to maintain sobriety, there is little hope of success in parenting.'" (citation omitted)). Even if the children could be in the sober-living community with the mother, she was only able to remain there for a limited time; she could not assure the juvenile court she would have a stable home for the children to which to return. And, when things got challenging in the past, she returned to her paramour despite his continued violent behavior toward her and his alleged use of illegal substances. *See In re K.L.*, No. 17-03496, 2017 WL 2465817, at *1 (Iowa Ct. App. June 7,

2017) (collecting cases affirming termination when the parent maintained a domestically violent relationship). Like the juvenile court, we are not convinced the barriers to reunification will be dismantled in six months.

When the father was asked what he would do with an additional six months, he stated "I was thinking maybe I could start doing some services or something." But, the father has already had two years to begin engaging with services. Each time he has begun to engage with them, he has quickly dropped off. *See In re L.L.*, 459 N.W.2d 489, 495 (Iowa 1990) ("Parenting cannot be turned off and on like a spigot. It must be constant, responsible, and reliable."). This recent interest does not convince us he is now permanently committed to parenting the children. *See In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000) ("A parent cannot wait until the eve of termination, after the statutory time periods for reunification have expired, to begin to express an interest in parenting."). Without evidence that the children could be returned to the father's care if he were given extra time, we agree with the juvenile court that a six-month extension was unwarranted.

*c. Permissive Factors.*

Finally, the mother argues the court should have invoked Iowa Code section 232.116(3)(c), which states the court need not terminate if "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." And, while it is true that the mother clearly loves her children and that the children enjoy being with her as well, there is not sufficient evidence that the disadvantages of terminating that bond overwhelm the need for termination. *See In re A.B.*, 956 N.W.2d 162, 169 (Iowa 2021) (noting, in regards to the permissive factor, that "the existence of a

bond is not enough"); *In re D.W.*, 791 N.W.2d 703, 709 (Iowa 2010) (stating "our consideration must center on whether the child will be disadvantaged by termination, and whether the disadvantage overcomes [the parent's] inability to provide for [the child's] developing needs"). These young children are adoptable and in a stable, pre-adoptive home that will keep them together and cared for; their best interests are served by the permanency termination can provide. *See A.B.*, 815 N.W.2d at 778 n.8 ("[W]e concur in the juvenile court's view that there is a bond between [the father] and [the children], but the children's safety, long-term nurturing and growth, and physical, mental, and emotional needs would be better served by termination of parental rights notwithstanding that bond."). We therefore agree with the juvenile court's choice not to forgo termination under section 232.116(3)(c).

**III. Conclusion.**

Given the father's track record and the years that have passed since any meaningful contact with his children, termination of his parental rights is in the children's best interests. An additional six-month extension is not warranted for either parent as time will not cure the reasons for termination. And, the strength of the bond between the mother and the children does not outweigh the need for termination. We affirm the juvenile court's order for termination of both the mother's and father's parental rights.

**AFFIRMED ON BOTH APPEALS.**